**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOHN ARMSTRONG; JAMES
AMAURIC; RICHARD PONCIANO;
JACK SWENSEN; BILLY BECK;
JUDY FENDT; WALTER FRATUS;
GREGORY SANDOVAL;
DARLENE MADISON; PETER
RICHARDSON; STEVEN HILL;
DAVID ROSE; DAVID BLESSING;
ELIO CASTRO; ELMER
UMBENHOWER; RAYMOND
HAYES; GENE HORROCKS; KIAH
MINCEY; CLIFTON FEATHERS;
WILLIE JOHNSON; DAVID
BADILLO; JAMES SIMMONS;
FLORA ABRAMS; JOEY GOUGH;
TIMOTHY WHISMAN,

      *Plaintiffs-Appellees,*

  v.

GAVIN NEWSOM, Governor;
CALIFORNIA DEPARTMENT OF
CORRECTIONS AND
REHABILITATION,

      *Defendants-Appellants.*

Nos. 20-16921
21-15614

D.C. No. 4:94-cv-
02307-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted September 21, 2022
San Francisco, California

Filed February 2, 2023

Before: Susan P. Graber, Michelle T. Friedland, and Eric
D. Miller, Circuit Judges.

Opinion by Judge Friedland

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed one district court order, and affirmed
in part and vacated in part a second district court order, in an
ongoing action initiated nearly thirty years ago by a class of
California prisoners who challenged the State's treatment of
disabled inmates.

This case began in 1994 when Plaintiffs sued the
California Department of Corrections and Rehabilitation and
the Governor (collectively, "Defendants") alleging
widespread violations of the Americans with Disabilities Act
and the Rehabilitation Act (collectively "ADA"). The

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

district court concluded that California prisons were failing to provide legally required accommodations, and this court affirmed. In these appeals, Defendants challenge two orders issued in 2020 in which the district court found ongoing violations of disabled prisoners' rights at the R.J. Donovan Correctional Facility ("RJD") and at five additional prisons ("Five Prisons") resulting from Defendants' failure to adequately investigate and discipline staff misconduct. The district court entered injunctions requiring Defendants to adopt additional remedial measures at the six prisons.

The panel first rejected Defendants' threshold contention that the district court did not have authority to issue either of the orders because the orders addressed misconduct that was "categorically distinct" from the allegations of wrongdoing in the Complaint. The panel determined that the new allegations in the motions at issue here were closely related to those in the operative Complaint and alleged misconduct of the same sort—that Defendants failed to accommodate class members' disabilities, in direct contravention of the ADA.

The panel next considered whether the district court's orders comported with the Prison Litigation Reform Act of 1995 ("PLRA"). The panel held that the record supported the district court's conclusions that there were ongoing ADA violations at each of the prisons and that a common source of those violations was the lack of sufficient accountability measures to address officer misconduct, which fostered a staff culture of targeting inmates with disabilities.

The panel affirmed the particular provisions of each order that address the prisons' investigatory and disciplinary failures. For example, the panel affirmed the district court's requirements that Defendants utilize additional surveillance

cameras and provide additional staff training.  The panel also held that the district court's requirement that Defendants reform the complaint process to better investigate, track, and discipline offending staff members was also justified; and that the investigatory and disciplinary reform measures complied with the PLRA's requirements that injunctive relief be narrowly drawn and no more intrusive than necessary.

Addressing the measures in the district court's orders that focused on preventing officer misconduct directly, the panel upheld those measures as to RJD, but could not affirm them as to the Five Prisons on the current record.  Thus, the panel affirmed the district court order that Defendants develop a plan to "more effectively monitor and control the use of pepper spray" by RJD staff.  The panel vacated, however, the pepper-spray measure in the Five Prisons order, finding that the evidence on which the district court relied was insufficient to justify the ordered relief.  The panel concluded that the district court abused its discretion by ordering Defendants to reform their pepper-spray policies at the Five Prisons and vacated that portion of the order.

The panel further concluded that the district court was justified in ordering that Defendants "significantly increase supervisory staff by posting additional sergeants" on prison watches at RJD.  But the record did not support an equivalent finding with respect to the Five Prisons.  The panel therefore held that the district court abused its discretion by ordering Defendants to increase supervisory staff at the Five Prisons and vacated that portion of the district court's order.

The panel addressed Defendants' remaining arguments in a concurrently filed memorandum disposition.

# COUNSEL

Jamie M. Ganson (argued), Deputy Attorney General; Alicia Anne Bower, Deputy Attorney General; Trace Maiorino, Deputy Attorney General; Neah Huynh, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California, Office of the California Attorney General, Sacramento, California; for Defendants-Appellants

Gay Crosthwait Grunfeld (argued), Michael W. Bien, Michael L. Freedman, Benjamin Joseph Bien-Kahn, Ernest Galvan, and Adrienne Pon Harrold, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California; Donald Specter, Rita K. Lomio, Alison Hardy, Sara Norman, and Margot Mendelson, Prison Law Office, Berkeley, California; Linda D. Kilb Claudia Center, and Arlene B. Mayerson, Disability Rights Education & Defense Fund Inc., Berkeley, California; Geoffrey Holtz, Morgan Lewis & Bockius LLP, San Francisco, California; for Plaintiffs-Appellees.

## OPINION

FRIEDLAND, Circuit Judge:

Nearly thirty years ago, a class of California prisoners challenged in federal court the State's treatment of disabled inmates. The district court concluded that California prisons were failing to provide legally required accommodations, and our court affirmed. Since then, the State has struggled to remedy the recognized violations, and the class has repeatedly returned to court, prompting the district court to order iterative injunctions that our court has largely affirmed. In this appeal, California officials challenge two orders in which the district court again imposed requirements on the State to correct ongoing violations of disabled inmates' rights. We affirm almost the entirety of the district court's orders.

### I.

### A.

This case began in 1994 when Plaintiffs, a class of California prisoners (the "*Armstrong* class"), sued the California Department of Corrections and Rehabilitation ("CDCR") and the Governor (collectively, "Defendants").[1] In the operative Complaint, Plaintiffs alleged widespread violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"), accusing Defendants of

---

[1] Initially, the litigation also included state parolees but subsequently was bifurcated, with parolees litigating their claims against the Board of Parole Hearings separately from the prisoners' claims against CDCR. *See Armstrong v. Brown*, 768 F.3d 975, 978 n.1 (9th Cir. 2014). The appeals now before us concern only those orders relating to accommodations for prisoners.

"discriminat[ing] against plaintiffs and the class they represent by reason of their disability."  Some of the allegations focused on physically inaccessible facilities in California's prisons.  Other allegations accused Defendants of failing "to make reasonable accommodations to individuals with disabilities in the programs, activities, services, benefits, and jobs they offer."

The district court certified a class of "all present and future California state prisoners . . . with mobility, sight, hearing, learning[,] and kidney disabilities that substantially limit one or more of their major life activities," and held that Defendants' treatment of disabled prisoners violated the ADA and RA.  *See Armstrong v. Wilson*, 124 F.3d 1019, 1020–21 (9th Cir. 1997).[2]  Accordingly, the district court ordered Defendants to produce a plan describing how they would remedy the violations of the class members' rights.  Defendants produced what has come to be known as the *Armstrong* Remedial Plan ("ARP" or "Plan"), *see Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010), portions of which the district court subsequently ordered Defendants to implement, *see Armstrong v. Davis*, 58 F. App'x 695, 697 (9th Cir. 2003).  *See also Schwarzenegger*, 622 F.3d at 1063 (describing the history of this litigation through 2010).

Realizing the promise of the ARP has not been easy.  Since the district court directed enforcement of the Plan, Plaintiffs have filed a series of motions contending that

---

[2] When it comes to discrimination by public entities, the ADA and RA "provide identical 'remedies, procedures, and rights.'"  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) (quoting *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)).  We therefore refer only to the ADA throughout the remainder of this opinion.

Defendants have failed to comply with the court's mandates. In response, the district court has issued further injunctions, most of which have been affirmed by our court, directing Defendants to take additional measures to ensure compliance with the court-ordered portions of the ARP and to prevent further violations of class members' rights. *See Armstrong v. Brown*, 768 F.3d 975, 988–89 (9th Cir. 2014) (affirming in large part); *Schwarzenegger*, 622 F.3d at 1063 (affirming the district court's holdings about the defendants' responsibility for violations and about the need for relief but remanding for further evidence on specific remedial measures); *Davis*, 58 F. App'x at 696 (affirming in full); *Armstrong v. Davis*, 275 F.3d 849, 879 (9th Cir. 2001) (affirming in large part).

In 2007, for example, the district court held that, "[w]hile some individual prisons have improved their compliance" with the ADA and ARP, "it has become increasingly clear that defendants are unable to meet their obligations," causing "significant harm to the plaintiff class." Accordingly, the district court entered a permanent injunction requiring Defendants to "develop a system" for holding prison staff "accountable for compliance with the Armstrong Remedial Plan and the orders of th[e] Court." The injunction was modified in 2012 to "clarif[y] and ma[k]e more detailed" Defendants' obligations regarding reporting and accountability after the district court concluded that Defendants' accountability system was ineffective. The district court modified the injunction again in 2014.

## B.

In 2020, Plaintiffs returned to court alleging pervasive violations of class members' rights under the ADA, filing one motion focused on a single prison and a second motion

focused on several more. In ruling on the motions, the district court found that there were ongoing violations of disabled prisoners' rights at six California prisons, resulting from Defendants' failure to adequately investigate and discipline staff misconduct. The district court entered two injunctions requiring Defendants to adopt additional remedial measures at the prisons.

**1.**

Plaintiffs' first motion sought relief at R.J. Donovan Correctional Facility (the "RJD Motion"). RJD has the second largest population of disabled inmates of any prison in California and houses nearly a thousand *Armstrong* class members. In 2018, auditors from within CDCR conducted a compliance review, jointly with Plaintiffs' counsel, of the disability policies at RJD. The auditors' resulting memo documented that inmates reported, among other allegations of misconduct, instances of "staff members forcefully removing some inmates from wheelchairs" and "assaulting inmates [who] were already secured with restraint equipment."

The State sent a "strike team" to RJD to investigate the reports of staff misconduct identified by the auditors. The strike team conducted a series of interviews in which inmates described prison staff targeting disabled inmates for abuse and retaliating against those who reported abuse. The strike team found that 48 of the 102 inmates interviewed "provided specific, actionable information, relevant to the foundational concerns" of staff misconduct that had prompted the review. In an email, CDCR's chief ombudsman and strike-team member wrote:

> I have never heard accusations like these in all my years. . . . Many of the inmates have expressed fear of what will happen to them tomorrow when the team is not there. . . . This is a very serious situation and needs immediate attention. If there is any means of installing cameras immediately I would strongly suggest it . . . . We will provide you any help you need.

The strike team recommended that prison management install surveillance cameras at certain locations, increase the presence of supervisory staff, and provide mandatory staff training, among other things.

Plaintiffs' counsel communicated with CDCR throughout 2019 about remedying the problems at RJD. Unsatisfied with the State's progress, Plaintiffs filed the RJD Motion in February 2020, asking the district court to impose further remedial measures at RJD. In support of the motion, Plaintiffs submitted 87 declarations from 66 inmates who claimed to have experienced or witnessed violations of class members' rights at RJD, along with two expert reports criticizing RJD staff's treatment of disabled inmates and the State's failure to investigate and discipline staff in response.

After briefing and argument, the district court granted Plaintiffs' motion in large part. The court found Plaintiffs' declarations uncontroverted because Defendants had not submitted competing declarations or any other evidence contesting the declarants' accounts. The district court also found the declarants credible, explaining that they "paint[ed] a very consistent picture of the conduct by RJD staff that disabled inmates experience[d]."

In its order, the district court recounted numerous incidents, which it described as "illustrative examples" of Plaintiffs' evidence that *Armstrong* class members were being denied reasonable accommodations or discriminated against because of their disabilities. In one such illustrative example, a mobility-impaired class member requested not to be handcuffed behind his back because he used a cane and walker. Instead of granting that accommodation, an RJD officer slammed the class member to the ground, causing him to hit his head on the concrete floor and lose consciousness for several seconds. When the class member awoke, the officer put his knee on the class member's throat and then kneed him in the face. As the district court noted, other mobility-impaired class members were also thrown to the ground rather than accommodated after requesting handcuffing accommodations. In another incident, an officer refused to stop shining a flashlight into the eyes of a vision-impaired class member who said that the light was painful and exacerbated his disability. When the class member asked to speak with a sergeant, another officer punched the class member in the jaw. Multiple incidents recounted by the district court described officers denying class members' requests for wheelchair pushers and for showers after incontinence incidents; others described officers closing doors on class members with mobility disabilities.

The district court also recounted incidents of retaliation. In one such incident, a class member asked an officer to help him lift a heavy package of mail. The officer refused, and the class member replied that he intended to file a complaint. In response, the officer pepper-sprayed the class member in the face, hit him in the face with the pepper-spray canister, and then kicked him. In another incident, an officer

threatened to lodge a fabricated rules-violation report against a class member if the class member filed a grievance reporting the officer's earlier failure to accommodate him. Multiple class members reported that they were afraid to request accommodations due to the threat of retaliation.

Relying on Plaintiffs' declarations and expert reports, the district court concluded that "RJD staff have denied reasonable accommodations to class members on many occasions, and that such denials were by reason of the class members' disabilities." The "root cause" of these violations, the district court found, was Defendants' "systemic and long-term failure" to "effectively investigate and discipline violations" of class members' ADA rights. The district court concluded that additional remedial measures were "necessary to prevent further violations" at RJD.

**2.**

While the RJD Motion was pending, Plaintiffs moved for similar relief at additional California prisons.[3] In support of that motion (the "Five Prisons Motion"), Plaintiffs incorporated the material they had filed with the RJD Motion and submitted two new expert reports plus declarations from seventy-five additional inmates describing incidents at those prisons (the "Five Prisons").

Those declarations differed from the declarations Plaintiffs had submitted in support of the RJD Motion in two ways. First, whereas the RJD declarations were all submitted by *Armstrong* class members, about half the

---

[3] Plaintiffs requested relief at seven prisons, but the district court ultimately declined to order relief at two of them—a ruling that Plaintiffs have not challenged. As a result, only five prisons are at issue with respect to the appeal from the ruling on that motion.

declarations submitted in support of the Five Prisons Motion were from disabled inmates who were not members of the *Armstrong* class. Rather, those declarations came from class members in a separate prison-conditions class action brought on behalf of "all [California state] inmates with serious mental disorders." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 898 n.11 (E.D. Cal. & N.D. Cal. 2009).[4] Second, whereas the RJD declarations were not disputed, the Five Prisons declarations were partially disputed. Defendants filed their own declarations—about one hundred in all—contesting some of the events described in the Five Prisons declarations. The district court did not attempt to resolve the factual disputes raised by the competing declarations. Instead, it recounted "illustrative examples" of incidents from Plaintiffs' declarations in which inmates described being denied reasonable accommodations and for which Defendants' declarations did not contest the relevant portions of the episodes. The district court recounted twelve such illustrative incidents—six of which involved *Armstrong* class members and all of which the district court found credible.[5]

Relying on the cited declarations and Plaintiffs' expert reports, the district court concluded that "staff have denied reasonable accommodations to inmates with disabilities on multiple occasions" at the Five Prisons, and "such denials were by reason of the inmates' disabilities." As with RJD, the district court found that the "root cause" of the ongoing

---

[4] The parties agree that mental illness is not a ground for *Armstrong* class inclusion.

[5] The district court did not make credibility determinations as to the inmate declarations that it did not explicitly reference in the Five Prisons Order.

violations in the Five Prisons was the "ineffectiveness" of Defendants' system for "investigating and disciplining" violations, which led to a "staff culture that condones abuse and retaliation against disabled inmates." The district court therefore concluded that additional remedial measures were "necessary to prevent further violations" of the ADA rights of disabled inmates at the Five Prisons.

**3.**

Having found that additional remedial measures were necessary to prevent further violations of class members' rights, the district court ordered Defendants to draft two remedial plans—one for RJD and one for the Five Prisons. The district court ordered Defendants to include, in both plans, measures in the following categories: (1) installing fixed surveillance cameras and body-worn cameras; (2) reforming staff complaint, investigation, and discipline processes; (3) monitoring by a court-appointed expert of staff investigation and discipline processes;[6] (4) sharing information with Plaintiffs' counsel and the court expert; (5) increasing supervisory staffing; (6) adding more staff training; (7) implementing anti-retaliation mechanisms; and (8) reforming pepper-spray policies. For each category, the district court outlined certain requirements that Defendants must include in the plans. For example, the court specified a retention policy for camera footage and required the investigation and discipline section of the plans to provide for quarterly interviews of disabled inmates. The district court also ordered Defendants to develop an electronic

---

[6] The expert was appointed pursuant to Federal Rule of Evidence 706 "to monitor Defendants' implementation of their plan to reform the staff complaint, investigation, and discipline policies and procedures."

"early-warning" tracking system for incidents of staff misconduct involving disabled inmates at the Five Prisons.[7]

### 4.

Defendants timely appealed both orders. We consolidated the appeals for the purposes of oral argument and address both in this opinion.

### II.

"We review the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error, and the injunction's scope for abuse of discretion." *Armstrong v. Brown*, 768 F.3d 975, 979 (9th Cir. 2014).

### III.

We first consider and reject Defendants' threshold contention that the district court did not have authority to issue either of the orders because the orders address misconduct that is "categorically distinct" from the allegations of wrongdoing in the Complaint.

"[A] district court has broad discretion to fashion injunctive relief." *Melendres v. Maricopa County*, 897 F.3d 1217, 1221 (9th Cir. 2018). But that discretion is not unbounded, particularly as to allegations of misconduct raised after a complaint is filed. Because "[t]he authority of the court is invoked at the outset [of litigation] to remedy particular . . . violations," a remedy is justified "only insofar as it advances the ultimate objective of alleviating the initial . . . violation." *Freeman v. Pitts*, 503 U.S. 467, 489 (1992). "[N]ew assertions of misconduct" do not support

---

[7] Defendants were not ordered to include this measure in the RJD remedial plan.

injunctions "entirely unrelated to the conduct asserted in the underlying complaint"—there must be a "sufficient nexus" between the new allegations and the complaint. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015).

The new allegations in the motions at issue here are closely related to those in the operative Complaint. The Complaint alleged broad violations of class members' rights under the ADA. Plaintiffs alleged, for example, that Defendants "discriminate against [class members] by reason of their disability," and that Defendants "failed to make reasonable accommodations to individuals with disabilities in the programs, activities, services, benefits, and jobs they offer." In the RJD and Five Prisons Motions, Plaintiffs allege misconduct of the same sort—that Defendants failed to accommodate class members' disabilities, in direct contravention of the ADA.

Defendants protest that the requisite nexus is lacking between the conduct alleged in the Complaint and that alleged in Plaintiffs' motions because the Complaint focuses narrowly on the provision of accommodations and does not allege the use of excessive force. But the mere fact that the ADA violations alleged in Plaintiffs' motions were sometimes accompanied by excessive force does not negate that they were also textbook denials of reasonable accommodations under the ADA—the precise type of conduct challenged in the Complaint. For example, in the RJD Order, the district court recounted an incident in which an officer punched an inmate in the face when the inmate requested that the officer communicate with him in writing, so as to accommodate his hearing disability. Refusing to communicate in writing with a deaf inmate and beating a deaf inmate who requests such a method of communication

are both denials of a reasonable accommodation.  That the allegations raised in Plaintiffs' recent motions described violent denials of accommodations makes injunctive relief all the more appropriate.

Similarly, retaliating against inmates who request accommodations or who report denials of accommodations deters inmates from pursuing accommodations in the first place.  The result is that inmates do not receive the accommodations required by the ADA—exactly what the Complaint alleged.[8]

## IV.

We next consider whether the district court's orders comport with the Prison Litigation Reform Act of 1995 ("PLRA").  The PLRA sets the standards for when a court may grant prospective relief concerning prison conditions. The Act instructs that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  The PLRA "mean[s] just what it says—before granting prospective injunctive relief, the trial court must make the findings" the PLRA mandates.

---

[8] Defendants briefly argue that the district court did not have the authority to issue the orders in the absence of a finding of a "changed condition" that hindered Defendants' compliance with the existing injunction.  But the authority to which Defendants point, *America Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021), describes the conditions under which a defendant may be *relieved* from its legal obligations under a consent decree.  *See id.* at 1097–98.  That test does not apply here, where Plaintiffs are requesting that the court impose *additional* obligations on Defendants to effectuate its prior orders.

*Oluwa v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998). We call those findings the "need-narrowness-intrusiveness" findings for short, *see, e.g.*, *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010), and we review them for clear error, *see Brown v. Plata*, 563 U.S. 493, 541 (2011).

## A.

In both of its orders, the district court found not only ongoing violations of class members' rights at the prisons, but also a common source of those violations: the lack of sufficient accountability measures to address officers' misconduct, which fostered a staff culture of targeting inmates with disabilities. The record amply supports both conclusions.

First, plenty of evidence demonstrates ongoing ADA violations at each of the prisons. Plaintiffs submitted more than 150 declarations in which inmates described prison staff denying accommodations to which they were entitled, retaliating against them for requesting accommodations, and retaliating against them for reporting officers' misconduct. With respect to RJD, the declarations were uncontroverted. And although Defendants submitted competing declarations contesting many of the incidents described by inmates at the Five Prisons, the district court nonetheless identified a dozen "illustrative" incidents described in the inmate declarations that were uncontested and "remarkably consistent" across the different prisons. Plaintiffs' experts also described ongoing violations at the prisons, concluding that (as we will further discuss shortly) the violations were a result of failures in Defendants' investigatory and disciplinary systems. Considered as a whole, the record supports the district court's conclusion that there were ongoing violations at each of the prisons at which it ordered relief. After all, it

is not simply the number of incidents that matters. "[I]f the injury is the result of . . . policies or practices pervading the whole system," system-wide relief is appropriate even if only a "relatively small number of plaintiffs" are injured. *Schwarzenegger*, 622 F.3d at 1072–73 (quoting *Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001)).

Second, the failures in Defendants' investigatory and disciplinary systems were well illustrated by Plaintiffs' two experts, both of whom opined that Defendants' accountability systems were inadequate systemwide. As one of the experts described the problems at the Five Prisons, when prison investigators reviewed a reported incident, they often "overlooked or intentionally ignored" evidence that supported the inmate's version of events or undermined the officer's version of events. Relying on a review of inmate declarations, incident reports, and case files, the expert described multiple occasions in which investigators discredited inmates' reports simply because they conflicted with prison officials' versions of the events—a conclusion that follows only if one assumes that prison officials' statements are never inaccurate and always truthful. The other expert described similar problems at RJD, noting that there is a "deep and ubiquitous" staff bias against disabled inmates and that inmates' testimony is commonly discounted or ignored during investigations there. That expert ultimately concluded that the failures were systemic and statewide.

Other evidence in the record also showed failures to investigate and to discipline wrongdoers. California's Office of the Inspector General ("OIG") issued a report concluding that the statewide system for investigating allegations of prison-staff misconduct was flawed and ineffective. Much like Plaintiffs' experts, the OIG

determined that prison investigators "displayed signs of bias in favor of their fellow staff when conducting their staff complaint inquiries" and "sometimes ignored corroborating evidence offered by inmate witnesses." Defendants' own data, produced to Plaintiffs during this litigation, also were consistent with systemic failures of accountability. The data showed that, despite dozens of allegations of abuse, only a relatively small number of incidents resulted in staff discipline.[9]

The district court found that those failures of accountability corrupted the staff culture at the prisons. As one expert described the problem, Defendants' failure to adequately investigate and discipline misconduct creates a vicious cycle in which individual failures of accountability escalate into a prison-wide culture of abuse. If prison staff are not held accountable when they unlawfully fail to accommodate disabled inmates—or when they retaliate against inmates who report such misconduct—disabled inmates will stop speaking up. And if prisoners do not speak up, there is less opportunity to hold officers accountable. Failing to hold officers accountable, in turn, can embolden staff by suggesting that they can violate inmates' rights with impunity—further discouraging disabled inmates from

---

[9] The district court observed that disabled inmates were "overrepresented" in the proportion of incidents that resulted in staff discipline. Defendants argue that this observation undermines the district court's finding that their disciplinary systems are inadequate, because it suggests that Defendants were disciplining staff who violated disabled inmates' rights. But the data are consistent with another interpretation—that the incidents of misconduct against disabled inmates were more egregious than those against non-disabled inmates. That the evidence is susceptible to competing interpretations does not mean that the district court clearly erred in its interpretation.

speaking up, as the threat of retaliation grows.

## B.

Defendants raise two specific challenges to the district court's conclusions that further relief was necessary at RJD and the Five Prisons, respectively.  We reject both.

## 1.

First, as to RJD, Defendants argue that judicial intervention was unnecessary because they already had taken steps to protect class members' rights and to improve accountability at that prison, obviating the need for further reform there.  Defendants do not dispute that ADA violations occurred at RJD.  Rather, they assert that they implemented several corrective measures at RJD in late 2018, including additional training for prison staff and changes to several management positions.  Such reforms, they argue, have addressed the problems that the district court identified.  Defendants point to data showing that reported incidents involving the use of force decreased in one facility within RJD by 44% between 2018 and 2019 and that staff-misconduct complaints at the same facility decreased by 40% over the same period.

The district court found that "reliable inferences about whether conditions for class members at RJD have improved cannot be drawn from Defendants' data."  That conclusion was reasonable.  First, the district court pointed out that Defendants' data involved only one facility at RJD, while other data suggested that reported incidents may have increased at other facilities within the prison.  Second, and more fundamentally, Defendants' data concerned *reported* incidents involving the use of force.  The utility of Defendants' data, then, was undermined by the district

court's finding—drawn from inmate declarations and expert reports—that a "significant number" of incidents "are *not* reported and therefore not reflected" in the data, at least in part because of class members' fear of retaliation by prison officers.

Defendants quibble with the district court's interpretation of the data, arguing that the court erroneously failed to focus on the period after Defendants implemented corrective measures. They also contend that the district court should have looked at per capita figures instead of total use-of-force incidents, because the prison population changed over the relevant period. But even if Defendants have persuasive reasons for their comparator preferences, the district court's overarching conclusion was that no reliable inferences could be drawn from the data, because the data did not reflect unreported incidents. That conclusion was reasonable. Moreover, even if conditions were improving somewhat, the district court referenced numerous episodes continuing well into 2020 in which RJD staff violated class members' rights—a finding that Defendants do not meaningfully contest. Neither Plaintiffs nor the district court had to sit idly by while Defendants violated class members' rights, even if Defendants were already making marginal improvements. *Cf. Barcia v. Sitkin*, 367 F.3d 87, 102–04 (2d Cir. 2004) (holding that the rate of violations was too high to find that the State was in compliance with a consent decree, notwithstanding some improvements).**[10]**

---

[10] Defendants similarly argue that reforms to staff-misconduct policies were unnecessary at all of the prisons because they reformed their statewide system for reviewing staff misconduct in 2020. But the district

**2.**

Second, as to the Five Prisons, Defendants argue that the district court erred in relying on evidence of staff misconduct directed at disabled inmates who were not members of the *Armstrong* class, alongside evidence of staff misconduct directed at *Armstrong* class members.[11] Defendants further assert that, once the evidence of violations against disabled inmates outside the *Armstrong* class is disregarded, the record does not support the district court's determination that further relief was required at the Five Prisons.

The district court explained its reliance on evidence of violations against non-class members in two ways. First, the district court reasoned that it could rely on evidence of staff misconduct directed at any disabled inmate because such misconduct violated its prior orders. According to the district court, many of the court-ordered provisions of the ARP extend to any "qualified inmate . . . with a disability," not merely those inmates whose disabilities fall within the ambit of the *Armstrong* class. We need not address Defendants' objections to that theory because the district court was justified in relying on the non-class-member evidence under its second rationale: that the declarations were relevant because they contain evidence that is probative of the conditions that class members experience at the

---

court considered—and did not err in rejecting—that argument. As the district court noted, the OIG expressly found in a February 2021 report that the problems with staff investigations and discipline that it had documented in its initial report "still persist[]," notwithstanding the implementation of Defendants' new system.

[11] As noted earlier, it is undisputed that mental illness is not a ground for *Armstrong* class inclusion, even if such mental illness renders the inmate "disabled" within the meaning of the ADA.

prisons.

The district court was justified in viewing the non-class-member evidence as highly probative of the conditions faced by class members. For example, the district court described an incident at one of the Five Prisons in which an inmate who suffered from debilitating depression and anxiety was assaulted by officers after he asked to speak to his mental health clinician—and then experienced retaliation when he filed a complaint reporting the misconduct. Although that inmate's specific disabilities fell outside the *Armstrong* class definition, the incident is probative of Plaintiffs' claim that prison officials denied accommodations to disabled inmates and retaliated against those who reported such denials. More generally, if an inmate sees officers retaliating against inmates who request accommodations for their disabilities, that inmate may think twice before requesting accommodations of his own, even if his disabilities are of a different kind. Witnessing retaliation against any disabled inmate—whether or not the inmate is a member of the *Armstrong* class—may accordingly deter class members from speaking up, contributing to the vicious cycle described above.

## C.

Defendants' remaining challenges to the district court's orders focus on particular provisions of each order that they claim cannot survive the need-narrowness-intrusiveness inquiry required by the PLRA. The provisions can be divided broadly into two buckets: those related to investigation and discipline, and those that attempt to prevent misconduct directly. Defendants' arguments are unpersuasive as to the first bucket because of the substantial proof of ongoing systemic failures of accountability that the

district court had previously—and unsuccessfully—tried to remedy. As to the second bucket, there is sufficient evidence that the measures were necessary at RJD, but we agree with Defendants that there is not enough evidence to support the ordered measures at the Five Prisons.

**1.**

Under the PLRA, "[t]he overarching inquiry is 'whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details'" of prison operations. *Armstrong v. Brown*, 768 F.3d 975, 983–84 (9th Cir. 2014) (quoting *Schwarzenegger*, 622 F.3d at 1071). A district court may, however, "provide specific instructions to the State without running afoul of the PLRA." *Id.* at 986. In particular, when a district court "has previously tried to correct the deficiencies" in prison operations "through less intrusive means, and those attempts have failed, relief prescribing more specific mechanisms of compliance is appropriate." *Id.*

Less intrusive means have been tried—and have failed— here. In 2007, the district court ordered Defendants to "develop a system for holding [prison staff] accountable for compliance with the Armstrong Remedial Plan and the orders of this Court." Five years later, however, "there had been no meaningful improvement to the State's tracking and accountability system," despite the injunction. *Id.* at 984. So the district court tried again, modifying its injunction to address the specific ways in which Defendants' accountability system had failed. *Id.* at 985. We upheld that modification, holding that, although its terms "might leave the State less discretion than injunctions typically approved in the PLRA context," that "level of intrusiveness [was] acceptable based on the history and circumstances of the

case"—particularly, Defendants' failure to comply with the previous, less-intrusive remedy. *Id.* at 986.

We are now back in a similar spot. Given the history and circumstances of this case, our precedents counsel heightened deference to the district court's factual findings. Keeping this in mind, we hold that the measures ordered by the district court to improve officers' accountability comply with the PLRA.

**a.**

The district court did not clearly err in finding that the remedial measures it ordered to address the prisons' investigatory and disciplinary failures were necessary to correct violations of class members' rights.[12] Turning first to the requirement that Defendants utilize additional surveillance cameras, the district court did not err in finding that additional cameras, both stationary and body-worn, were necessary. With more direct evidence showing what happened during an incident, it will matter less whether investigators are inclined to credit officers' accounts of incidents over inmates' accounts. And, as even Defendants' experts noted, the installation of additional cameras will itself help to deter further violations.

Defendants argue that it was nonetheless unnecessary to

---

[12] Again, those measures fall into the following categories: (1) installing fixed surveillance cameras and body-worn cameras; (2) reforming staff complaint, investigation, and discipline processes; (3) monitoring staff investigation and discipline processes by a court-appointed expert; (4) sharing information with Plaintiffs' counsel and the court expert; (5) adding more staff training; (6) implementing anti-retaliation mechanisms; and (7) developing an electronic "early-warning tracking system" for staff misconduct incidents involving disabled inmates at the Five Prisons.

order Defendants to install additional cameras, because the State was already committed to doing so voluntarily. But voluntary plans may change. Particularly considering Defendants' prior failures to improve their accountability systems in the absence of specific, court-ordered instructions, it was reasonable for the district court to include measures in its orders that Defendants may have adopted voluntarily.[13] *See Brown*, 768 F.3d at 985 (holding that the district court did not err in finding that further relief was necessary after its previous orders had failed to protect inmates' rights). For a similar reason, we affirm the district court's requirement that Defendants provide additional staff training. The mere fact that Defendants already provide some training to staff does not undermine the district court's finding that further training is necessary.

The district court's requirement that Defendants reform the complaint process to better investigate, track, and

---

[13] The RJD and Five Prisons Orders required Defendants to retain indefinitely footage of use-of-force incidents involving disabled inmates. The remedial plans that the district court ultimately approved, however, required Defendants to retain such footage for only five years. We hold that the district court had jurisdiction to make that minor change to its orders because the change "preserved the status quo and did not materially alter the status of the case on appeal." *NRDC, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). We therefore consider the provision as it appears in the ultimately ordered remedial plans, rather than in the original orders, for purposes of the need-narrowness-intrusiveness inquiry. Although Defendants challenged the indefinite retention period, they do not challenge the five-year retention period—which, in any event, is an appropriate length of time to ensure that the footage exists throughout the course of any investigation.

discipline offending staff members was also justified.[14]
Each of those remedial measures was selected to address the
specific shortcomings in Defendants' accountability systems
that the district court identified, such as Defendants'
frequent failure to initiate investigations into alleged ADA
violations, and their inability to identify staff who repeatedly
violate class members' rights.  Addressing those failures will
help to reform the problematic staff culture of targeting
inmates with disabilities for abuse.   And requiring
Defendants to "develop mechanisms" to end and prevent
retaliation against disabled inmates who report violations is
directly responsive to the district court's finding that prison
staff retaliate against disabled inmates.

Defendants urge us to vacate portions of the district
court's orders that they contend are redundant and thus
unnecessary.  But "[p]rospective relief for institutions as
complex as prisons is a necessarily aggregate endeavor,
composed of multiple elements that work together to redress
violations of the law." *Schwarzenegger*, 622 F.3d at 1070.
The district court was not required to take a piecemeal, wait-
and-see approach—for example, by first ordering additional

---

[14] The original orders required Defendants to "ensure that officers
accused of serial violations of the ARP or ADA . . . are reassigned."  The
remedial plans that the district court ultimately approved clarify that
Defendants need not reassign officers automatically based on mere
accusations.  Rather, the court approved a policy whereby the hiring
authority considers a range of factors—including the nature of the
allegation, strength of the evidence, and previous misconduct by the
officer—when deciding whether reassignment is appropriate.  For the
reasons explained, *see supra* note 13, we consider the provision as it
appears in the final remedial plans for purposes of the need-narrowness-
intrusiveness inquiry.  In its narrower form, that provision appropriately
addresses Defendants' failure to discipline serial offenders adequately.

surveillance cameras to see whether they were sufficient to remedy the situation before also ordering body-worn cameras. "What is important, and what the PLRA requires, is a finding that the set of reforms being ordered . . . corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." *Id.* at 1071.

In any event, many of the provisions that Defendants contest as redundant serve distinct purposes. To return to the same example, the district court reasonably found that body-worn cameras were necessary, even considering the requirement that CDCR install additional stationary surveillance cameras. As one of Plaintiffs' experts explained, body-worn cameras can provide information that stationary surveillance cameras cannot—including sound and views into remote prison spaces—that will be useful in investigating alleged misconduct by officers. That expert also noted that the use of body-worn cameras in prisons has been shown to result in fewer uses of force, particularly when used in conjunction with stationary surveillance cameras.

### b.

The district court's investigatory and disciplinary reform measures also comply with the PLRA's requirements that injunctive relief be narrowly drawn and no more intrusive than necessary. Arguably the most intrusive of the district court's remedial measures was the requirement that Defendants conduct quarterly interviews of randomly selected disabled inmates using the methodology and interview questions that Defendants had utilized in connection with the 2018 investigation of RJD. But as we recognized in *Armstrong v. Brown*, such specificity is

permissible where, as here, the district court was confronting noncompliance with its prior, less intrusive, orders.    768 F.3d at 986.    The district court included the quarterly interview requirement to address Defendants' failure, in violation of prior court orders, to investigate and track staff misconduct and to hold staff accountable for ADA violations.  Considering that history, the district court was justified in concluding that more specific measures were required to remedy violations of class members' rights this time around.

Defendants argue that the remedial measures in the Five Prisons Order fail the narrowness requirement because the order repeatedly refers to "disabled inmates," rather than simply "class members."  For example, the order requires that all correctional officers "who may have any interactions with disabled inmates" wear body cameras and requires CDCR to "develop an electronic system for tracking all staff misconduct incidents involving disabled inmates" at the Five Prisons.  But as we explained above, the violations that the district court sought to remedy stemmed from defective systems of accountability and a problematic culture whereby staff targeted disabled inmates for abuse.  It would not be possible to cordon off *Armstrong* class members from other disabled inmates for the purposes of establishing effective accountability measures and reforming the staff culture at the Five Prisons.  And Defendants nowhere contend that the ordered relief helps non-class members without also helping class members.  The district court therefore did not clearly err in including all disabled inmates in the scope of the relief

ordered.[15]

## 2.

We turn now to the measures in the district court's orders focused on preventing officer misconduct directly. We uphold those measures as to RJD, but we cannot affirm them as to the Five Prisons on the current record.

## a.

First, the district court ordered Defendants to develop a plan to "more effectively monitor and control the use of pepper spray" by staff at the prisons.

We affirm this measure with respect to RJD. The record describes numerous incidents in which RJD staff improperly pepper-sprayed class members—frequently in response to a class member's request for a reasonable accommodation or in retaliation for a class member's reporting staff misconduct. In one incident recounted by the district court, a group of officers tackled an inmate who had become upset after an officer denied his request to be handcuffed in a way that accommodated his disability. The inmate blacked out, and the officers pepper-sprayed him while he was unconscious. Plaintiffs' experts, too, described various incidents in which RJD staff improperly pepper-sprayed class members. For example, after a wheelchair-bound inmate told an officer he was going to report him for unprofessional conduct because the officer called him a

---

[15] Defendants briefly argue that the provision requiring information-sharing with Plaintiffs' counsel and the court expert improperly fails to make exceptions for "applicable privileges." But as Plaintiffs point out, there are protective orders in place, and nothing in the orders prevents Defendants from raising a privilege concern, should one ever arise.

"retard," the officer pepper-sprayed the inmate, threw him from his wheelchair, and stomped on his back. Those and other incidents support the district court's finding that reforms to RJD's pepper-spray policy are necessary to correct violations of class members' rights at RJD. And the measure itself is narrowly tailored and minimally intrusive of prison operations—the district court merely ordered Defendants to "more effectively monitor and control" the use of pepper spray by staff, without dictating how Defendants were to do so.

We vacate, however, the pepper-spray measure in the Five Prisons Order. The evidence on which the district court relied in finding that this measure was necessary—three incidents of disabled inmates being pepper-sprayed—was insufficient to justify the ordered relief. As Plaintiffs point out, those incidents were not the only ones in the record describing inmates being pepper-sprayed. But many of the additional incidents were contested by declarations submitted by Defendants, and the district court did not resolve those factual disputes or determine whether the additional uses of pepper spray were improper. We therefore decline to consider those additional incidents as evidentiary support for the district court's finding that modifications to the prisons' pepper-spray policies were necessary to prevent further violations of class members' rights at the Five Prisons. *Cf. Schwarzenegger*, 622 F.3d at 1073 (considering only the evidence that the district court relied upon in making its PLRA findings, despite the existence of further evidence in the record). As a result, the incidents of pepper-spray misuse on which the district court relied are not so pervasive to support a finding of a culture of improper pepper-spray use targeting inmates. Rather, the pepper-spray evidence is "composed largely of single incidents that

could be isolated." *Id.* Accordingly, we conclude that the district court abused its discretion by ordering Defendants to reform their pepper-spray policies at the Five Prisons.

**b.**

Second, the district court ordered Defendants to "significantly increase supervisory staff by posting additional sergeants" on prison watches.[16] We hold that the district court was justified in ordering such relief at RJD. The 2018 "strike team" that CDCR sent to investigate allegations of staff misconduct at RJD recommended such a measure, explaining that paperwork demands leave overworked supervisory staff with little time for active supervision that would prevent staff misconduct. Even Defendants' expert made a similar observation, commenting on the heavy load of the administrative duties associated with supervisory positions at RJD and recommending that CDCR add sergeants at RJD to compensate. We therefore hold that, on this record, the district court did not err in finding that additional staff at RJD were necessary to correct violations of class members' rights and that the measure was sufficiently tailored.

But the record does not support an equivalent finding with respect to the Five Prisons. The reports from both the strike team and Defendants' expert concerning overworked supervisors were specific to RJD, and there were no equivalent expert opinions about the Five Prisons. Although

---

[16] The original orders required Defendants to post "additional sergeants on all watches on all yards." The final orders approved by the district court, however, increase the sergeants only on some of the watches on some of the yards. For the reasons described above, *see supra* note 13, we consider the narrower provision for the purposes of the need-narrowness-intrusiveness inquiry.

the district court found that there was a "pervasive lack of timely follow through" by prison staff on many allegations of staff misconduct at the Five Prisons, the record does not suggest—and the district court did not find—that the failure stemmed from an insufficient quantity of supervisory staff. We therefore conclude that the district court abused its discretion by ordering Defendants to increase supervisory staff at the Five Prisons.

## V.

For the reasons set forth above, we affirm all portions of the RJD Order.  We also affirm all of the Five Prisons Order except the provisions requiring Defendants to increase supervisory staffing (Section 5(g)) and to modify pepper-spray policies (Section 5(j)), which we vacate.[17]

**No. 20-16921 AFFIRMED. No. 21-15614 AFFIRMED in part, VACATED in part.**

---

[17] We address Defendants' remaining arguments, challenging discovery and evidentiary rulings the district court made in the process of adjudicating the Five Prisons Motion, in an unpublished memorandum disposition filed concurrently with this opinion.